Hart *v.* Achilles.

———————o●●————————

HART, receiver of the Orleans Insurance Co. *vs.* ACHILLES.

A certificate, by examiners appointed by the comptroller, under section 11 of the act of April 10, 1849, relative to the incorporation of insurance companies, stating that they have made an examination, and found that a mutual insurance company "has received, and is in actual possession of capital, consisting of premium notes, to an amount at least equal to the amount required by said act, to wit, the sum of $100,000;" and that from the best information they are able to obtain, they are "satisfied that the said notes are valid, for the purposes specified in the 5th section of said act," is substantially in conformity with the requirements of the 11th section of said act, and is sufficient.

And .if the comptroller, after reciting the report of the examiners, certifies "that the said company is possessed of an amount of capital equal to the amount specified" in the 5th section of the statute, this, also, is sufficient in point of form.

Hart *v.* Achilles.

A promissory note, given to a mutual insurance company about to be formed, for the amount of an insurance to be consummated by the company upon its organization, by which the insured promises to pay to the company the sum specified, in such proportions and at such times as the directors of the company may, agreeably to the charter and by-laws, require; such note being made for the purpose of complying with the provisions of the act of April 10, 1849, relative to the incorporation of insurance companies, and of constituting a part of the capital stock; is payable absolutely, and can be collected by a receiver of the company upon its failure.

The act of April 10, 1849, does not authorize the formation of insurance companies upon the mutual, and the stock plans, combined.

Hence a company, organized under that act, cannot accept premium notes from a portion of its customers, and cash premiums from the remainder; and then assess the premium notes to pay losses occurring in either department.

MOTION for a new trial upon exceptions, ordered to be heard at a general term. The action was upon a premium note, in these words: "For value received, in policy No. 1875, dated Jan. 25th, 1851, issued by the Orleans Insurance Company, [I] promise to pay the said company, or their treasurer for the time being, the sum of three hundred and fifty dollars, in such proportions, and at such times, as the directors of said company may, agreeably to their charter and by-laws, require. (Signed) H. S. ACHILLES."

The questions discussed are sufficiently presented in the opinion.

*Arad Thomas,* for the plaintiff.

*H. R. Selden,* for the defendant.

*By the Court,* MARVIN, J. There was a motion for a nonsuit, upon the ground that the Orleans Insurance Company had never been legally organized. The objection was, that the certificates annexed to the proposed charter were not in conformity with the requirements of the statute; and the counsel specified wherein they were defective. It should be stated that the Orleans Insurance Company was, by its arti-

cles of association or charter, to conduct its business on "the plan of mutual insurance." The comptrollor, as authorized by § 11, appointed three persons to make an examination, and these persons, after receiving their appointments, &c., certified "that we have this 5th day of June, 1850, made an examination, and found that said company have received, and are in actual possession of capital, consisting of premium notes, to an amount at least equal to the amount required by said act, to wit, the sum of $100,000." The examiners add, "We further certify that, from the best information we are able to obtain, we are satisfied that the said notes are valid for the purposes specified in the 5th section of said act." The statute requires the examiners to certify, under oath, in the case of a *mutual company*, "that it has received, and is in actual possession of the capital, premiums, or engagements of insurance, as the case may be, to the full extent required by the 5th section of the act." (*Session Laws* 1849, 445, § 11.) The comptroller, after reciting the report of the examiners, certifies "that the said company is possessed of an amount of capital equal to the amount specified in the section aforesaid."

For the purpose of ascertaining whether the certificates of the examiners and comptroller were in accordance with the requirements of the act, it will be necessary to examine § 5, referred to; and, for the purpose of construing this section, it will be necessary to examine other portions of the statute. The 1st section of the act is very general, authorizing the formation of *insurance* companies, including insurance on health and life, and the power to grant, purchase or dispose of annuities. The 4th section authorizes the opening of books for subscription to the capital stock of the company intended to be organized, and to keep them open until the full amount specified in the charter is subscribed, or "in case the business of such company is proposed to be conducted on the plan of mutual insurance, then to open books to receive propositions, and enter into agreements, in the manner and to the extent hereinafter specified." Then follows the 5th section.

It speaks of *joint stock* companies, to be organized in the city of New York and the county of Kings, requiring a capital of $150,000 at least ; and in any other county of the state a capital not less than $50,000. It then speaks of companies formed on the plan of *mutual insurance,* located in the city of New York or county of Kings. They are not to commence business "until agreements have been entered into for insurance with at least 100 applicants, the premiums on which, if it be marine, shall amount to $300,000, or if it be fire or inland navigation, shall amount to $200,000, and notes have been received in advance for the premiums on such risks, payable at the end of, or within, twelve months from date thereof, which notes shall be considered a part of the capital stock, and shall be deemed valid, and shall be negotiable and collectable for the purpose of paying any losses which may accrue, or otherwise." Then comes the clause, "nor shall any mutual insurance company, in any other county in the state, commence business until agreements have been entered into for insurance, the premiums on which shall amount to $100,000, and the notes received therefor, payable as aforesaid, and which notes shall be liable for and used as aforesaid."

Thus, it is seen, when these provisions are dissected and separated, that companies proposed to be conducted upon the plan of mutual insurance, were to be formed by opening books to receive *propositions,* and enter into agreements in the manner specified, viz : agreements for insurance, the premiums on which should amount to $100,000, and notes to be received therefor. The character of these notes is declared. They are to be received in advance for premiums, and it is declared that they shall be considered a part of the capital stock. Turn now to the 11th section. The examiners are to "certify under oath, that an amount equal at least to the amount specified in the 5th section of this act, if it be a joint stock company, has been paid in, and is possessed by it in money, or in such stocks, and bonds and mortgages, as are required by the 8th section of this act; or if a *mutual company,* that it has

received, and is in the actual possession of the capital, premiums, or engagements of insurance, as the case may be, to the full extent required by the 5th section of this act." What is meant by the words "capital, premiums, or engagements of insurance," followed by the words "as the case may be," and then by a reference to the 5th section of the act? We have seen that there was but one mode of forming these companies, and that was by agreements entered into for insurance, the premiums on which should amount to $100,000; and that notes should be taken therefor, in advance, for the premiums. What is meant by "premiums?" The 5th section does not require the payment of premiums, or authorize the receipt of any premiums. Notes in advance for the premiums were to be given. If the language were "capital and engagements," and rejecting the words "as the case may be," there would be no difficulty, as by the 5th section it is declared that the notes shall be considered a part of the capital stock; or if the term "capital," only had been used, we should have no difficulty, as it would mean the notes described in the 5th section. The language used in the certificate is, "that the company has received, and is in actual possession of capital, consisting of premium notes, to an amount at least equal to the amount required by said act, to wit, one hundred thousand dollars."

I am inclined to think the certificate sufficient. It is a certificate that the company had the amount of capital, to wit, $100,000, required by the statute, and that it consisted of premium notes. In the statute they are not called premium notes, but notes in advance for the premiums. There was no great impropriety in calling them *premium* notes.

The defendant offered to prove that the company, at the time of its organization, had no notes, except such as were in the form and terms of the one in suit; that is, that they were payable "in such proportions, and at such time or times, as the directors of said company may, agreeably to their charter and by-laws, require." The evidence was excluded, and the

defendant excepted. It is insisted that such notes were not authorized by the statute in forming the company, and if so, that no company has been formed. I think that *White, receiver &c.* v. *Haight,* (16 *N. Y. R.* 310,) answers this objection. In that case, the note was given in the course of the formation of the company, and was, in form, substantially like the note in the present case; and it was held by the court of appeals that the note, being made for the purpose of complying with the provisions of the act, and of constituting a part of the capital stock, was payable absolutely, and that it might be indorsed and transferred by the corporation; and that it could be collected. This case is in point. The supreme court had not the benefit of this case, when *Williams, receiver &c.* v. *Babcock,* (25 *Barb.* 109,) was decided.

It appeared, from the evidence, that the assessment was made upon notes amounting to $112,000. The aggregate of assessments was near $77,000. The assessment upon the defendant's note was $249.25. A large portion of the losses were upon policies issued for *cash premiums;* the assured, or policy holders, having given no notes. The witness stated that he thought two-thirds in amount of the losses for which assessments were made were of this class, and that no corresponding assessments were made against the claimants. He specified a large number of such persons, and the amounts of losses. Thus it is seen that this company conducted its business upon the mutual insurance plan, by taking premium notes from the assured, who thus became members of the company, and also upon the cash plan, that is, receiving from the assured a cash premium without any notes. The result being, that in case of losses in both cases, a resort might be had to the notes alone for the payment of such losses. Had the company authority to proceed in this way?

It is declared, in the articles of association or charter, that the business of the company shall be conducted on the plan of mutual insurance. It is then added: "It shall possess all the powers conferred by said act, and which now or here-

after may be conferred by law, upon an incorporated com-
pany formed under said act for the purpose aforesaid, but
whose business is to be conducted on the plan aforesaid." It
is in another section declared, that the company shall regulate
and determine the rates of insurance, and the amount, by pre-
mium notes or cash, to be received from the insured, &c.
Again: "It shall be lawful for any person applying for insur-
ance, if he shall so elect, to pay such definite sum in money, as
the company may determine, in full for said insurance, and in
lieu of a premium note."

The capital was to be not less than $100,000, to consist of
premiums received, premium notes, and such cash capital as
by consent of the board of directors may have been added.
It is also provided that the board of directors may, pursuant
to the provisions of the act, unite a cash capital, as an addi-
tional security to the members, over and above their premi-
um and stock notes, and prescribe the mode and manner in
which said cash capital shall be subscribed and united as
aforesaid. Here is a sufficient reference to the charter for our
present purpose, and its provisions are, probably, sufficient to
justify the practice under it. The question then is, did the
statute of 1849 authorize such a charter? In my opinion it
did not. The statute is extremely obscure, faulty and imper-
fect, and great difficulties have arisen in construing it. An
attempt was made in this act, and such was its design, to pro-
vide for the organization of insurance companies upon differ-
ent principles and plans from what was previously practiced.
But it was never the design that one company should possess
the powers combined, of each and all the companies author-
ized by the act; and, in so understanding the act, a fatal
error has been committed. Indeed, if proper reflection had
been bestowed upon the subject by those engaged in forming
companies under the act, they must, or ought to have seen
that the system, provided for in the act, could not be practi-
cably united. The statute is entitled "an act to provide for
the incorporation of insurance companies." The 1st section

Hart *v.* Achilles.

is general. The 2d section relates to reinsurance. The 3d section relates to the mode of organizing and the evidence of it. The 4th section authorizes individuals, associated for the purpose of organizing any company under the act, after publishing a notice, &c., " to open books for subscription to the capital stock of the company so intended to be organized, and to keep the same open until the full amount specified in the statute is subscribed ; or, in case the business of such company is proposed to be conducted on the plan of mutual insurance, then to open books to receive propositions, and enter into agreements in the manner and to the extent hereinafter specified." Here is a provision relating to joint stock companies to be formed with a certain amount of capital, and which company, when organized, is to insure third persons, who, in no sense, are to be members of the company ; and also another provision, relating exclusively to companies proposing to conduct their business on the plan of mutual insurance. These companies are to be different and distinct things, acting upon different principles, and governed by different rules, and the two cannot, in practice, be united. At any rate the legislature has authorized no union.

The 5th section requires a certain amount of capital, in case the company is a "joint stock company." It then contains provisions relating to companies formed for the purpose of doing business " on the plan of mutual insurance." By reading this section carefully, it will be seen that it provides that no mutual insurance company, in any county other than New York and Kings, shall commence business until agreements have been entered into for insurance, the premiums on which shall amount to $100,000 ; and the notes received therefor, payable as aforesaid, (that is, " at the end of, or within twelve months from, date thereof,") and which notes shall be liable for and used as aforesaid, (that is, " shall be considered a part of the capital stock, and shall be deemed valid, and shall be negotiable and collectable for the purpose of paying any losses which

may accrue, or otherwise.") These provisions relate to companies to be formed on the plan of mutual insurance.

It is not necessary, in this case, to enter upon an extended explanation of these provisions. I had occasion some years since, at special term, to consider them, and I came to the conclusion that it was necessary that agreements should be entered into for insurance, and that notes should be given for the premiums amounting in the aggregate to $100,000. I thought that there should be a "proposition" to become insured upon a specific house, ship, or other insurable property, and that an agreement should be made, and a note for the premium given, so that when the company was organized and commenced doing business, it could, and would, at once issue the policy to the individual who had entered into the agreement for insurance, and had given his premium note.

As I understand Denio, Ch. J., in *White* v. *Haight*, (16 *N. Y. R.* 310,) he does not appear to regard the entering into an agreement for any specific insurance, at the time the note is given, as material. He regards them as notes payable absolutely, constituting the capital upon which the company is authorized to commence business, and entitling each maker of a note to policies of insurance, the premiums on which will amount to the amount of the note, and that the note is to be paid at all events. This construction of the statute, as to the notes, is very important, and I have no doubt correct; and yet I apprehend that but very few persons who have given their notes *to aid* in the formation of these companies, supposed at the time that such was their liability. In the opinion, to which reference is here made, the learned chief justice has given a history of the legislation of the state, relating to mutual insurance companies, prior to the act of 1849; and although the question involved and decided in that case was very different from the question we are now considering, the opinion is of great service in elucidating the question. In the present case construction must be given to the

Hart *v.* Achilles.

words, " plan of mutual insurance," and " mutual insurance company."

The statute does not prescribe the mode and manner of doing business after the company is incorporated, but it declares that it shall be the duty of the corporators of any and every company, organized under the act, to declare in the charter the mode and manner in which the corporate powers, given under and by virtue of the act, are to be exercised. (§ 10.) It does not follow from this, that a company organized to do business on the " plan of mutual insurance" can also, by so providing in its charter, do business as a joint stock company. In other words, such company cannot, by so providing in its charter, do any and all kinds of insurance, in any and all the modes and manner contemplated by the statute for the different companies. The corporators are to declare in the charter the mode and manner in which the corporate powers given under and by virtue of the act are to be exercised ; that is, if a mutual company, the mode and manner of exercising the powers applicable to such companies. If a joint stock company, then the mode and manner of exercising the powers applicable and proper for such companies. And for the purpose of ascertaining what powers are applicable to mutual insurance companies, and the mode and manner of exercising the powers, it is important to know what a *mutual insurance company* is. Judge Denio, in *White* v. *Haight,* (*supra,*) after giving a history of the legislation down to 1849, says, that mutual insurance consists in the association of individuals for the purpose of insuring each other. The association was not to have any dealings in regard to insurance, except with its own members. Each one of these members was to be insured, and to be indemnified, in the case of a loss, at the expense of all the other members. The very term " mutual insurance company" implies all this. All the members of the company mutually insure each other. The mode and manner of accomplishing this may be, and has been, different. The mode prescribed in the early charters in this state

was, that the person insured should deposit his promissory note for such a sum of money as should be determined by the directors, and a part of the note, exceeding five per cent, was to be immediately paid. Such person became a member of the company, and was bound to pay for losses in proportion to the amount of his promissory note. (*See Charter of Jefferson Co. Mut. Ins. Co., Sess. L.* 1836, *p.* 43, §§ 6, 8.) Some years later a different system was adopted in some of the charters—generally in the cities—by which the note of the assured was dispensed with, and the cash premiums only were paid. In some of the charters the plan of receiving notes for premiums in advance, of persons intending to receive policies, was adopted, for the security of the dealers with the company. In some of the charters authority is given to the company to receive from any person or persons money, in the aggregate not exceeding a certain amount, and to issue certificates therefor, and allow interest and profits, if any. This money, so received, was liable for losses. The persons advancing it, however, did not become insured. I have looked pretty generally through the legislation from 1836. I shall not here refer to the various statutes I have consulted. They, and others, will be found in the session laws. My object in consulting them has been to ascertain whether any company, organized on the plan of mutual insurance, has been authorized to enter into the contract of insurance with a third person who did not become, and was not to become, a member of the company. I have found no such instance, and I apprehend none can be found. All who become insured in a mutual company become members, and are bound to contribute for all losses, in one form or another. It will be found, also, in all the schemes, that there is a complete *mutuality*. In those cases where no notes were to be given, it was supposed that the premiums would be sufficient to pay losses, and careful provisions were inserted relating to the premiums and their investments. When money was received from third persons it was placed in hazard for losses, in consideration of the

Hart *v.* Achilles.

agreement to pay interest, and also profits, if any should be made. But it will be found, on consulting the statutes and the different systems, complicated as some of them are, that there was a complete *mutuality* between all those who were insured and became members.

I have no doubt a mutual insurance company may be organized, under the act of 1849, upon any plan of *mutual insurance* previously adopted, or probably upon any plan not prohibited by law, which should be *mutual*, and by which each should be insured by all the others, and all the others by him. But the plan must be such as to be practical and capable of execution. It should not contain provisions inconsistent and in conflict with each other, and which cannot be carried into effect. For instance, I do not see how a mutual company can take a premium note from one of its members, and a small portion of the note in money, and from another a large sum of money and no note. Any one can see that this cannot be mutual. The risks, or rather the liability of the insured, are not the same.

He who has given his note may be called upon to pay it in full. If so, he must pay a much larger sum than he who paid all cash for his policy. If not called upon to pay any of the note, then he will be in a better condition than the man who paid a larger cash premium without any note. There is no mutuality in this mode of doing business; assuming that he who paid cash only for his policy is a member of the company. If he is a member of the company, he should be assessed to pay losses; and how can this be done justly, he having paid a much larger sum in cash for his policy than those who gave notes?

I suppose, however, that the cash policy-man is not regarded as a member of the company. The charter in the present case is extremely meagre. It declares, what was quite unnecessary, that it (the company) shall possess all the powers conferred by the act. It would have had all the powers which the act conferred in a case where the business was to be

conducted on the plan of mutual insurance, if it had been silent. What the statute requires is that the *mode* and *manner* of exercising the powers given should be declared in the charter. It is declared in the charter, after speaking of premium notes, &c., that "it shall be lawful for any person applying for insurance, if he shall so elect, to pay such definite sum in money as the company may determine, in full for said insurance, and in lieu of a premium note." This provision and mode of doing business, in connection with the mutual insurance plan, with premium notes, are, in my opinion, unauthorized by the statute. As I understand, it is claimed in this case that the corporation had the power to insure for cash those who should not become members. In other words, it could do all that a joint stock company could do. The two systems cannot be united. Those persons who obtained policies for cash only, are either members of the company, and if so, should be assessed for their proportion of the losses; or they are not members, and the agreements upon which their policies were issued were void, and the company incurred no liability upon the policies. There must be a new trial; costs to abide the event.

[ERIE GENERAL TERM, November 29, 1858. *Grover, Greene* and *Marvin,* Justices.]